## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **SHANGRILÁ PARTNERSHIP** and<br>**SILVIA LAZO**,<br><div align="center">*Plaintiffs*,</div><br>v.<br><br>**HELENA MARIA LEMOS**;<br>**HAMILTON PRAXEDES DA SILVA**;<br>**COMUNIDADE TERAPEUTICA**<br>**ACREDITAR**<br> **a/k/a Centro Acreditar Grajaú**<br> **a/k/a Centro de Acolhimento Acreditar**;<br>**I BELIEVE CHURCH**; and<br>**DOE ENTITIES 1-5**,<br><div align="center">*Defendants.*</div> | Civil Action No. _____ |

### COMPLAINT AND JURY DEMAND

Shangrilá Partnership ("Shangrilá Partnership") and Silvia Lazo ("Lazo"), through its attorneys Brian Pangrle, Linda Kennedy and Bill Panagos, for their Complaint against Helena Maria Lemos ("Lemos"), Hamilton Praxedes da Silva ("Praxedes"), Comunidade Terapeutica Acreditar Grajaú ("CTA"), I Believe Church ("IBC"), and Doe Entities, state as follows:

1.      This action is to redress damages incurred by a family of United States citizens and a business established in the U.S., and involving a U.S. Permanent Resident Card awardee, as caused by a family member who structured a criminal gang that set out to take total control of family and business assets at any cost to the benefit of the gang and their associated enterprises. After being away from the family for decades, U.S. citizen and Defendant Helena Lemos ("Lemos")—an estranged daughter of U.S. Permanent Resident Card awardee, Sonia Mannelli ("Mannelli") and estranged sister of U.S. citizen, Silvia Lazo ("Lazo")—reappeared from the

<div align="center">1</div>

shadows, upon knowing of Mannelli's terminal illnesses, to mastermind a conspiracy aimed at taking total control of family and business assets through extortion, emotional and physical abuse, wire fraud, money laundering, and other crimes. Despite best efforts, Plaintiffs are left in the dark as to the status of their assets and those of Mannelli, including Shangrilá Partnership's rental property income, operating capital, and sales proceeds, and Mannelli's U.S. Social Security benefits. Admittedly, Lemos and her co-conspirators have resorted to use of cash transactions to intentionally hide their crimes where the gang is intermingling portions of the cash with their enterprises, Defendants Comunidade Terapeutica Acreditar ("CTA") and I Believe Church ("IBC"). Worse, Lemos and her co-conspirators have physically sequestered the wheelchair-bound Mannelli in a rundown, hillside shack on one of Plaintiffs' properties in São Paulo, Brazil ("SP Property") that Lemos' co-conspirators have taken over to the benefit of the gang and their enterprises. Albeit Lemos and a self-entitled "Pastor", Praxedes, proclaim to be acting "in the name of God", in reality, they hide behind the religious imagery and messaging of CTA and IBC, entities funded through their racketeering and conversion of Plaintiffs' and Mannelli's assets, to solicit goods and money from the unsuspecting public.

2.      Mannelli is a vulnerable adult, 89 years old, and diagnosed with a Demential Syndrome, inoperable metastasized breast cancer, diabetes, immobility due to severe arthritis, and auditory deficiencies; and certainly, suffering from immense pain. Lemos and her co-conspirators have not only sequestered Mannelli, they have emotionally and mentally abused Mannelli, including objectifying and humiliating Mannelli in media they produced and posted on U.S.-based platforms such as Instagram and Facebook (Meta Platforms, Inc., Menlo Park, CA) as part of an ongoing advertising campaign, funded at least in part through their racketeering activities to defraud people into depositing money into bank accounts listed for Defendants CTA

and IBC. Lemos and her co-conspirators are blocking Plaintiffs' access to their family member and business agent, Mannelli, as well as access by local healthcare workers seeking to assist Mannelli at the SP Property. In furtherance of the conspiracy, Lemos and her co-conspirators are (i) telling Mannelli that Lazo wants to put Mannelli in an insane asylum, (ii) feeding the diabetic Mannelli sugar-laden junk food, and (iii) causing Mannelli to take drug cocktails known to have serious and life-threatening reactions (e.g., Serotonin Syndrome), against the stern warnings of clinical providers. Plaintiffs are outraged that professional management of Mannelli's pain and multiple ailments have been deliberately neglected. Lemos and her co-conspirators are denigrating Mannelli and expediting her death in an outrageously heinous manner to achieve their goals.

3.      Lemos, an individual with an established history of running failed businesses, associating with criminals, and scheming against and abusing family members, sensed in the shadows of the global COVID-19 pandemic a vulnerable link for exploitation, her elderly mother Mannelli—who for decades served as an agent of U.S.-based Shangrilá Partnership, an entity involved in interstate and foreign commerce (managed by Lazo), and having salubrious contractual relations with Mannelli and others along with capital and real estate holdings. Underestimating Lemos' greed, Lazo thought that Lemos would exercise common sense and mercy, and allow Lazo to continue to care for Mannelli, as Lazo has for decades. Indeed, Lazo's care included Mannelli's mother, Eugenia Mannelli ("Eugenia"), who Lemos had also mentally and physically abused at an earlier moment in time. When Lemos failed to demonstrate a scintilla of concern and wished Mannelli dead, at great personal risk and financial cost, Lazo took action in an effort to protect Mannelli and Shangrilá Partnership from Lemos' reach.

4.      Upon arriving in Brazil to check on Mannelli at the SP Property, Lazo was confronted by Lemos' gang of co-conspirators, who took total control of the SP property, tortiously interfering with Shangrilá Partnership's income, beneficial contracts, business relationships, and business expectancies. In furtherance of the conspiracy, Lemos' right-hand man, co-conspirator Praxedes, erected a large 10' x 25' metal entry gate asserting access to the property, moving immobile Mannelli out of the main house near the gate, with level flooring and ample living space, into a rundown, hillside shack on a steeply sloping portion of the land thereby making it impossible for Mannelli to reach the gate on her own. Through their actions, Lemos and her co-conspirators not only dominate the SP Property, they dominate Mannelli, treating her as an object rather than a human.

5.      As to Praxedes' demonstrated control of the SP Property, in one instance, Praxedes detained Lazo at the gate while he made a call to an associate of CTA, directing this associate to "get in place" to execute a premeditated, nefarious, and sophisticated ruse, part of a plan that unfolded in subsequent weeks. Once Praxedes' associate was in place, Praxedes instructed Lazo to proceed down to the shack where Mannelli was sequestered while delivering enigmatic message: "there could be consequences." Once at the shack, Lazo was immediately confronted by Praxedes' associate, Wellison França ("França"), a drug-addicted and recently-released violent felon who was lying-in-wait inside the shack. Upon Lazo's entry, França sprung from his hiding spot and proceeded to videotape, provoke and harass Lazo, narrating fictitious infractions, and placing Lazo in fear for her life. The immobile Mannelli, unable to leave the shack on her own and suffering from a Demential Syndrome, was profoundly confused by the commotion and began screaming incessantly for Praxedes: "Pastor Hamilton [Praxedes], Pastor Hamilton, Pastor Hamilton, . . ." thirteen times. Lazo, was eventually able to soothe Mannelli;

however, the vulnerable, sequestered Mannelli was clearly demonstrating symptoms of parental alienation and Stockholm Syndrome (e.g., during this episode, Lazo observed the total absence of family photos in the shack, indicating that Lemos and her co-conspirators were engaged in a process of erasing Lazo and her husband from Mannelli's life). In accord with the nefarious plan, Praxedes approached the shack feigning surprise at the accusations França was relating, while at the same time suppressing his glee over the threats against Lazo. Lazo, being physically outnumbered by two men with histories of violence and having no way to physically get Mannelli out of the hillside shack, left the SP Property emotionally distraught out of fear of her life and, of course, loss of her business or property.

6.     In another instance, upon Lazo's arrival in a bulletproof vehicle, and wearing a bulletproof vest, Praxedes again blocked Lazo's access to the SP Property and Mannelli. Praxedes immediately phoned Lemos in Holland, Michigan to receive and execute Lemos' orders in real-time, which resulted in Praxedes issuing additional threats against Lazo. Lazo observed attack dogs roaming by the gate of the SP Property. Hence, even if Praxedes allowed Lazo to enter, given the presence of the attack dogs, she would be at extreme risk of harm. Once again, in fear of her life, Lazo retreated.

7.     On multiple occasions, in furtherance of the conspiracy, Praxedes threatened to call the police on Lazo if she did not acquiesce to the co-conspirators' demands and, indeed, Praxedes made good on these extortion threats by actually filing a false police report against Lazo that relied on testimony of França, the drug-addicted, violent felon that, per orders of the co-conspirators, had threatened and emotionally distressed Lazo weeks earlier. Upon filing the false police report, the co-conspirators also requested a court-issued Protective Order to prevent Lazo from being anywhere near Mannelli, her mother and agent of Shangrilá Partnership. At

both personal and financial cost to Plaintiffs, Lazo worked diligently to quickly expose the allegations as being false, which quashed the co-conspirators' request for a Protective Order.

8.      As to Lemos, operating out of Holland, Michigan, in furtherance of the conspiracy, she, twice, submitted a sworn statement to Brazilian Officials attesting that Mannelli was totally lucid, merely suffering from skin cancer, and adequately being cared for by Praxedes.[1] Indeed, when Lemos' first submission did not work, she maliciously re-submitted the same misleading statement, attempting to prevent Mannelli from being examined by a mental health professional in a scheduled appointment. Combating Lemos' statements cost Plaintiffs considerably, including costs in responding to set the record straight along with travel from the U.S. and lodging costs to assure that Lazo was present at the mental health appointment, for which an official report was issued <u>one year later</u> acknowledging that Mannelli—who had already been diagnosed with terminal metastasized breast cancer—was indeed suffering from a Demential Syndrome, whereby Mannelli was deemed unable to distinguish licit from illicit or to handle more than trivial sums of money.[2] The one-year delay in issuing that official report is also a direct consequence of Lemos' and her co-conspirators' malicious fraudulent acts.[3] Plaintiffs are in possession of an authenticated video of Praxedes standing next to a Brazilian Official showing text messages received from Lemos on his cell phone, wherein Praxedes: (i) asserts that he is in constant contact with Lemos; (ii) that Lazo, <u>who he has met</u>, has ongoing discords with

---

[1] Lemos states that Mannelli, as sequestered by the gang, is under the care of a "substitute family".

[2] Five forensic mental health experts have issued their concurrence on the diagnosis of a Demential Syndrome.

[3] Indicia of violations of the Travel Act, 18 U.S.C. § 1952, and the Foreign Corrupt Practices Act (FCPA) exist, which are violations that fall within the definitions of predicate acts under the federal Racketeer Influenced and Corrupt Organizations Act (RICO).

Mannelli; (iii) that Lemos is a good-natured daughter and person; and (iv) that Mannelli is fine.[4]
Of the foregoing, the only statements that are true are the non-stop communications with Lemos,
and a previous encounter with Lazo—an encounter which Praxedes later swore, before a
different Official, <u>as having never occurred</u>. Examples of the co-conspirators' ready resort to
criminality are manifold and continue; thereby, necessitating this lawsuit to, at a minimum,
prevent further harm to Mannelli and Plaintiffs.

9.     Defendants have and continue to intentionally inflict severe emotional distress
upon Lazo, and Defendants' have and continue to tortiously interfere with Plaintiffs' business
contracts, relationships and expectancies. Defendants conspired to harm Plaintiffs principally by
physically, emotionally, and financially abusing Plaintiffs' and Plaintiffs' family member and
business agent, Mannelli. Defendants abused Mannelli in Lazo's presence, prevented Plaintiffs
from providing Mannelli desperately needed medical care, and enjoying familial and business
interactions. Defendants conspired under a common plan to expedite Mannelli's death and
transfer to them personal and business assets, including assets of the Shangrilá Partnership,
thereby injuring Plaintiffs in their business or property.[5] Rather than cease and desist when given
notice, including notice of business relationships and contractual obligations between Plaintiffs
and Mannelli, Defendants escalated their outrageous acts. Defendants are violators of the
Racketeer Influenced and Corrupt Organization Act (RICO), directing an enterprise to achieve a

---

[4] To lend legitimacy to his statements, Praxedes advanced selective evidence to the Brazilian
Official: "Let me show it [Lemos' text messages] to you [Brazilian Official] here, so as to not
say that a Pastor is lying, right? It's good to show it."
[5] Injuries to Plaintiffs include personal injuries and injuries to both tangible property and
intangible property (e.g., reputation, goodwill, marketing, etc.). Defendants have directly caused
injuries to Plaintiffs and Lazo's husband in their business or property.

common goal through their racketeering activities. Plaintiffs ask this Court to enjoin Defendants, award damages, enhanced damages, and attorney fees and cost.

## JURISDICTION AND VENUE

10.    Plaintiff Silvia Lazo is a U.S. citizen and resident of Missoula, Montana, and daughter of Mannelli. Lazo holds a PhD and JD degrees, and is a former tenure-track professor at the University of Texas. Lazo graduated from Syracuse College of Law in 2023, receiving her JD degree. Due to personal and business harm inflicted by Defendants, Lazo has been unable to sit for the bar exam, which is a further injury to Lazo's business or property.

11.    Non-Party Brian Pangrle, spouse of Plaintiff Lazo, son-in-law of Mannelli, and partner of Plaintiff Shangrilá Partnership is a U.S. citizen and resident Missoula, Montana, who comes from generations of European-American builders of residential and commercial properties. Pangrle holds a PhD in Chemical Engineering and a JD degree and is the CEO of a California Professional Corporation that provides legal services to major multinational corporations. Defendants' intentional infliction of personal and business harm has impacted Pangrle, and hence, the California Professional Corporation and his family, namely, Lazo, along with the Shangrilá Partnership.

12.    Plaintiff Shangrilá Partnership is a partnership in the State of Montana, wherein each partner of the Shangrilá Partnership is a citizen and resident of the State of Montana and wherein Lazo is the managing partner.

13.    Defendant Helena Maria Lemos ("Lemos") is a U.S. citizen and resident of Holland, Michigan, the estranged daughter of Mannelli, having not visited Mannelli in thirty years, along with being the estranged sister of Lazo. Defendants' racketeering activity, schemes, artifices, frauds, etc., depend on the biological relationships between Lemos, Lazo, and Mannelli.

As the oldest daughter, Lemos uses her voice and words to impart an air of authority and legitimacy to mislead healthcare workers, Government Officials, and others, particularly as to Lazo's character and intentions and the health status of Mannelli. Throwing malicious boomerangs from Holland, Michigan, Lemos knows that they will return to the U.S. to hit their intended target, her sister Lazo in Missoula, Montana.

14.    Defendant Hamilton Praxedes da Silva ("Praxedes"), a self-proclaimed "pastor" and a citizen of Brazil, lives on Plaintiffs' property in São Paulo, Brazil ("SP Property") and is involved in a relationship with and in constant contact with Defendant and co-conspirator Lemos through electronic means (wire). Praxedes runs more than four social media accounts for Defendants CTA and IBC, often posting photographs of himself playing soccer, playing in a band, and engaged in other leisure activities, in various posts wearing "Michigan" and "Detroit" T-shirts. Below, a photograph of Praxedes is presented as posted to one of the Facebook social media accounts for Defendant CTA.



15.    Defendant Centro Terapeutica Acreditar ("CTA") is an entity with a presence in at least São Paulo, Brazil, owned and operated by at least Praxedes that advertises and solicits funds through electronic means (wire), including U.S.-based platforms Facebook and Instagram (Meta Platforms, Inc., Menlo Park, CA), as to services for the treatment of alcoholics and drug-addicts. Various posts show Praxedes in refurbished spaces on the SP Property, while the nearly 90-year-old Mannelli has been relegated to living in squalor in the rundown hillside shack. Various social media posts soliciting donations from the public include the message "bless God's work" or the motto "Acreditar: Uma Nova Historia" ("Acreditar: A New History"), which embodies Defendants' objective to substitute the loving family history between Lazo, her husband, and Mannelli, and their respectable business, for Defendants' new ventures. Upon information and belief, Defendant Lemos has an interest, management role, or director/officer role in CTA.

16.    Defendant I Believe Church ("IBC") is an entity with a presence in at least São Paulo, Brazil, owned and operated by at least Praxedes, that advertises and solicits funds through electronic means (wire), including U.S.-based platforms Facebook and Instagram, as to religious services (e.g., sermons, counseling, music, etc.). Upon information and belief, Defendant Lemos has an interest, management role, or director/officer role in IBC.

17.    Defendants Praxedes, ATC, and IBC have the requisite "minimum contacts" with the State of Michigan and with the U.S. These Defendants utilize U.S.-based social media platforms to advertise using their trademarks and Mannelli's image to solicit goods and monies via posts that reach a U.S. audience, including those in Michigan and other English or Portuguese speaking communities within the U.S. and its territories (e.g., consider their English language trademark "I Believe Church"). Praxedes wears Michigan logo shirts in various

10

Facebook and Instagram posts. The Defendants Praxedes, ATC, and IBC rely explicitly on authority derived from Lemos' filial status and her actions in Michigan in furtherance of their conspiracy and racketeering. As stated by Praxedes himself, he is in "non-stop" communication with Lemos, to ask for orders and receive them. Upon information and belief, Defendant Lemos has an interest, management role, or director/officer role in ATC and IBC and advertises the services of ATC and IBC in her community in the Western District and elsewhere. Further, under the Michigan partnership test of *Byker v. Mannes*, 465 Mich. 637, 641 N.W.2d 210 (2002), Praxedes and Lemos are, at a minimum, partners of a partnership-in-fact. Yet further, Mannelli's U.S. Social Security benefits may be at play.

18.    Defendants Does 1-5 are individuals or entities in Brazil, the U.S., or elsewhere.

19.    Relevant Non-Party Maria Cristina dos Santos ("Santos") is a citizen of Brazil and an occupier of the SP Property that acts under the control of Praxedes and Lemos. Santos has represented to Brazilian Officials that she is "the caretaker" of Mannelli or, at other times as suits the conspiracy, that she is "just a neighbor" of Mannelli. Santos has falsely affirmed to others in public places that Lazo has abandoned Mannelli and the SP Property. Santos accompanies Mannelli to planned appointments, including outings with Praxedes, where Mannelli is under their constant surveillance, in conformance with Lemos' orders. Santos operates as a crew member in furtherance of the conspiracy. Santos may or may not be one of the Does 1-5.

20.    Relevant Non-Party Isaac Jose Selles ("Selles") is a citizen of Brazil and the partner of Santos, cohabitating with Santos on the SP Property. Selles also acts under the control of Praxedes and Lemos. Selles may or may not be one of the Does 1-5.

21.    Relevant Non-Party João Batista do Nascimento ("Batista") is a citizen of Brazil and a driver that operates under the orders of Praxedes and Lemos. Batista transports Mannelli

for planned appointments and errands outside of the SP Property, where Mannelli is under his constant surveillance. Batista operates as a crew member and guard of Mannelli in furtherance of the conspiracy. Batista may or may not be one of the Does 1-5.

22.    Relevant Non-Party Fabio Willian Domingues Silva ("Attorney Domingues") is a citizen of Brazil and an attorney that operates under the orders of Praxedes and Lemos or otherwise manages and controls their enterprise or enterprises. Attorney Domingues is not a medical doctor or other healthcare professional. The relationship between Praxedes and Attorney Domingues extends at least back to the year 2010, which pre-dates, by years, Praxedes' meeting of Mannelli. In one instance, in furtherance of the conspiracy, Attorney Domingues falsely represented himself as Mannelli's caretaker, to gain access to a medical doctor that was supposed to perform a medical examination of Mannelli, that was paid for by Plaintiffs. Attorney Domingues' intentional and malicious actions confounded the medical examination, which, rather than being an hour in duration, lasted only 10 minutes. Attorney Domingues operates as a consigliere that guides Praxedes and Lemos in furtherance of the conspiracy. Attorney Domingues may or may not be one of the Does 1-5.

23.    Relevant Non-Party Wellison Dias França ("França") is a citizen of Brazil that operates under the orders of Praxedes and Lemos. França is a drug-addicted, violent felon that was recently released after serving seven years in prison for qualified robbery. França operates as a crew member in furtherance of the conspiracy. França may or may not be one of the Does 1-5.

24.    Defendants Lemos, Praxedes, CTA, IBC, and Does 1-5, listed above, along with one or more of the Relevant Non-Parties, have conspired to engage in a pattern of racketeering activity, have each committed numerous criminal acts as part of their scheme to harm, defraud and extort Plaintiffs, and have each participated in the operation or management of an enterprise

or enterprises. At least Defendants Lemos and Praxedes shall be referred to herein as the "RICO Defendants." One or more of CTA, IBC, and Does 1-5 may be included in the group of RICO Defendants.

25.    This Court has subject matter jurisdiction over Plaintiffs' claims at least under 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964. Plaintiffs' civil RICO claim for relief arises at least under 18 U.S.C. § 1961 et seq., as hereinafter more fully appears. There is also complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs' state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts. Thus, this Court also has supplemental jurisdiction over Plaintiffs' state law claims at least under 28 U.S.C. § 1367.

26.    Venue is proper in this District at least under 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965, at least because the headquarters of the conspiracy, mastermind of the conspiracy, and a substantial part of the events giving rise to this action have occurred and continue to occur in this District, including the use of electronic means (e.g., wire) in this District, and, further, Defendant Lemos resides in this District. Additionally, jurisdiction exists over one or more Defendants pursuant to one or more of 18 U.S.C. § 1965(b), FRCP 4(k)(1), FRCP 4(k)(2), the U.S. Constitution (e.g., Fifth Amendment), the Michigan long-arm statute, co-conspirator theory or doctrine, and/or one or more other theories, further noting that Brazil is a signatory to the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention").

## GENERAL ALLEGATIONS

27.    During the 1980s, Mannelli and her husband, Mr. Donald Lazo, a natural born citizen of the U.S. and the father of Lazo and Lemos, lived in the U.S. at which time Mannelli acquired a U.S. Permanent Resident Card and a condominium in the U.S. Around 1990, Mannelli and Mr. Donald Lazo moved to Brazil.

28.    Plaintiffs and Mannelli have always had a harmonious relationship, particularly in support of Mannelli following Mannelli's separation from Mr. Donald Lazo in the early 1990s, which resulted in the precipitous decline of Mannelli's income and familial companionship. Having to additionally maintain her own elderly mother, Eugenia, Mannelli became dependent on Plaintiffs for emotional and financial support, which, in part, was provided through a business relationship with Plaintiffs, including the Shangrilá Partnership.

29.    Lemos, the estranged daughter of Mannelli, has a checkered past that includes abusing her grandmother Eugenia while Eugenia was visiting the U.S. and housed with Lemos.

30.    In or about 1996, Lemos married the illegal immigrant Carlos Oliveira ("Oliveira"), who like Praxedes, was a self-proclaimed "pastor". In or about 1996, Oliveira was convicted for kidnapping and attempted rape a minor in Massachusetts, for which, Oliveira was sentenced to several years in prison. See: Appellate Opinion: *Commonwealth v. Oliveira*, 53 Mass. App. Ct. 480, 760 N.E.2d 308 (2002).

31.    As to Lemos' abuse of her grandmother, Eugenia –mother of Mannelli and Lemos' and Lazo's grandmother– , during a visit Eugenia made to the U.S., Lemos let Eugenia's U.S. visitor visa expire. In an ill-conceived approach to the situation, Lemos drove the elderly Eugenia hundreds of miles to the northern border, attempting to enter Canada, where Eugenia was refused entry. As the vehicle turned around, Eugenia was arrested by the U.S. Customs and

Border Protection and deported. Due to Eugenia's arrest and deportation, Eugenia could not re-enter the U.S. for an extended period of time, if ever again. Faced with new constraints created by Lemos' abuse of the family, Mannelli remained primarily in Brazil to care for Eugenia, with sporadic visits to Lazo and Lazo's husband in the U.S., noting that Lazo and her husband visited Mannelli in Brazil annually.

32.     In or about 2001, Lazo and her husband began operating a business, Shangrilá Partnership, which provided capital for Mannelli, as an agent, to buy, manage, and lease residential and commercial properties. At that time, Lazo also lived in a condominium in the same complex as Mannelli's U.S. condo. After moving, Plaintiffs leased their condo as part of their real estate portfolio. During their visits, Mannelli and Plaintiffs conducted business in both the U.S. and Brazil.

33.     In or about 2001, Shangrilá Partnership purchased its first property in the Northeast of Brazil, appointing Mannelli as an agent to buy, manage, and lease additional residential and commercial properties. In the years that followed, Plaintiffs worked with Mannelli to buy, manage, and sell various properties.

34.     Given the demonstrated harmonious and mutually beneficial personal and business relationships between Plaintiffs and Mannelli, in 2012, Mannelli recorded a Last Will & Testament, bequeathing all her assets to Plaintiffs, in part also as a prophylactic measure to protect Plaintiffs from Lemos, who, living in Holland, Michigan, was estranged and physically distant.

35.     In 2015, Mannelli signed a contract acknowledging Plaintiffs' purchase and ownership of the SP Property (a property at Ave. Carlos Barbosa Santos 631/653, Santo Amaro,

São Paulo, Brazil) and, further, as their agent, Mannelli would procure its subsequent sale to prospective buyers.

36.    Plaintiffs paid taxes on the SP Property and provided for Mannelli's maintenance on the property until its forthcoming sale, noting that subsequent provisions had been made for the elder's housing and care with her closest family.

37.    In 2015, another one of Plaintiffs' properties, a 10-unit inn in the Northeastern beach town of Jacumã, Brazil, frequented by tourists from around the world and advertised by Plaintiffs in the U.S., was sold and the resulting proceeds held by Mannelli, as an agent, as operating capital in a bank account on behalf of Plaintiffs.

38.    Subsequently, with permission from Plaintiffs, Mannelli was allowed to seek out a lessee of the SP Property. Mannelli leased the SP Property to Defendants Praxedes and CTA, while Mannelli continued to procure the sale of the SP Property.

39.    In 2020, the global COVID-19 pandemic delayed the sale of the SP Property, and physical visitation between Plaintiffs and Mannelli was also impeded. As in most of the world, communication between Plaintiffs and Mannelli took place through electronic means and by mail, as Plaintiffs sent Mannelli care packages including Personal Protective Equipment (PPE) in an effort to help protect her from the virus.

40.    In an afternoon of April 2022, Lazo suddenly sensed that Mannelli appeared confused during a phone conversation, wherein Mannelli reported a "small lesion" on her chest which she attributed to a "skin cancer".

41.    Through her prompt efforts, Lazo came to know that Mannelli was assailed by an inoperable, advanced breast cancer, with extensive lesions spread across her chest and shoulders, which, having been untreated for several months, resulted in a life-threatening infection.

Medically, Mannelli's condition is <u>not</u> the same as having "skin cancer" because the malignant cells that assail Mannelli are breast cancer cells. To be clear, Mannelli is diagnosed with metastasized advanced breast cancer. Defendants, in furtherance of their conspiracy, to portray Mannelli as being in better health, would tell people that Mannelli had a "minor skin cancer." Lemos, in particular, after being personally informed of Mannelli's inoperable and terminal breast cancer, utilized this lie several times in furtherance of the conspiracy.

42.     In or about April 2022, in an uncharacteristic and violative conduct of her fiduciary duties, Mannelli related to Plaintiffs that the SP Property had been "given away" to Defendant CTA, as owned and managed by at least Praxedes, and where Lemos is believed to have an interest, management role, or director/officer role therein. Lies about Mannelli's health status combined with Mannelli's statement evidencing apparent breaches of duties were extremely troubling and caught Plaintiffs' attention. Something was very wrong.

43.     As to observations of Mannelli's failing mental state, Lazo consulted medical experts who suggested the diagnosis of frontotemporal dementia (FTD), which disintegrates memory and decision-making, resulting in socially-inappropriate, at times even illicit, conduct (e.g., lack of empathy and impaired mutual understanding), and atypical behavior for the affected individual.

44.     In or about April 2022, Lazo attempted to discuss Mannelli's health with her estranged sister, Lemos, in a civil effort to harmonize end-of-life care for the elder, to which Lemos replied: "Let the mother die. Any effort spent on her is useless because she'll never return to the plenitude of life."

45.     In or about June 2022, Lazo traveled from the U.S. to Brazil to visit Mannelli at the SP Property, and was immediately impeded by Praxedes. Lazo notified Praxedes that she was

the owner of the SP Property and requested a copy of the lease, which he declined to provide. Upon information and belief, CTA's lease on the SP Property was expired, yet, Praxedes was controlling access to the entire property, indeed, erecting the large 10' x 25' sliding metal gate. Later, Plaintiffs discovered that decisions as to access and opening of the gate were being made in real-time through electronic means (wire) by the mastermind of the conspiracy, Lemos, while she remained comfortably over 5,000 miles away in Holland, Michigan.

46.     During Lazo's June 2022 trip, Praxedes told Lazo that Mannelli could only be seen by an appointment, which, at earliest, would take place in a couple of weeks, at a location and manner selected by him. Praxedes deliberately delayed the meeting by weeks in an effort to cause Plaintiffs emotional and financial harm, with a hope that Lazo would have to travel back to the U.S. such that the meeting with her mother and business agent would never occur. This was an alarming departure from the five decades of loving and joyful interaction between mother and daughter, wherein Mannelli would eagerly await Lazo and her husband's arrival at the airport lounge for their annual visits.

47.     Eager to meet her mother, Lazo was forced to acquiesce to the meeting constraints making lodging and flight arrangements to extend her stay in Brazil. Lazo was forced to conform to the date, time, and location (the specifics of which were kept secret until the last moment), a busy, noisy, and unsafe bar. On the day of the meeting, Mannelli was escorted by the physically and verbally aggressive driver, Batista, who reports to Praxedes. Batista repeatedly provoked Lazo attempting to elicit a reaction. During the meeting, Mannelli manifested verbal offenses and wild confabulations, for instance, in accusatory tone claimed that Lazo was a "problematic child" necessitating constant parental care. As another sign of dementia, Mannelli voiced suspicions that Lazo was after her money, clearly confusing Lazo with her estranged daughter Lemos.

18

48.    In 2022, Mannelli uncharacteristically swapped her long-time attorneys for Attorney Domingues, a close friend of Praxedes. Attorney Domingues assisted and continues to assist the co-conspirators toward their goals, acting well out-of-bounds of the role of an attorney.

49.    In 2022, the Defendants escalated the mental and social alienation of Plaintiffs, by igniting a campaign of disparagement which included telling Mannelli that Lazo intended to intern Mannelli in an asylum to steal her Brazilian pension income (approximately US $300.00/month).

50.    As time progressed, Mannelli's health continued to declined, while she suffered neglect and mental abuse by the Defendants. Mannelli is currently wheelchair bound, and has been sequestered in a rundown hillside shack on the SP Property when she should, at a minimum, be living in the large main house, which is level and provides greater transport accessibility. The hillside shack where Mannelli is sequestered places her at significant risk of fall or of being dropped when carried about, and is very dusty, cold, with broken windows, and mold clumps. The circumstances indicate that Mannelli, diagnosed with a Demential Syndrome, is also suffering from Stockholm Syndrome.

51.    On or about November 2022, when a Brazilian Official did a welfare check on Mannelli at the SP Property, she exhibited mental confusion erroneously claiming that she "never married" and suffered from "skin cancer"—instead of recognizing that the chest blisters were a symptom of inoperable, terminal breast cancer. Further demonstrating a lack of self-determination and defective decision-making, she turned to Praxedes seeking permission to sign a form presented by the Brazilian Official, to which Praxedes replied in the affirmative. Mannelli then said: "If you [Praxedes] say I can sign, if you say it's normal, I'll sign." On the same occasion, Praxedes accompanied the Brazilian Official to the gate, showing messages from

Lemos on his cell phone. The audio-video recording of this occasion captures statements made by Praxedes: (i) asserting that he is in constant contact with Lemos; (ii) that Lazo, who he has met, has ongoing discords with Mannelli (iii); that Lemos is a good-natured daughter and person; and (iv) that Mannelli is fine. Of the foregoing, the only statements that are true are the non-stop communications with Lemos, and a previous encounter with Lazo—an encounter which Praxedes later swore, before a different Official, as having never occurred. Like Lemos, Praxedes deviates from the truth, and exhibits no qualms about falsely denigrating Lazo as a person, her intentions, and reputation to undermine her legitimate efforts before government authorities, in furtherance of their conspiracy.

52.    Consolidating control over the elder, on or about February 2023, Praxedes began to announce through electronic means, via social media posts using U.S.-based platforms Facebook and Instagram, that Mannelli was "an emotional therapist" of CTA.[6] Praxedes also posted media that objectified and humiliated Mannelli, a vulnerable adult, as it is plainly apparent that Mannelli, diagnosed with a Demential Syndrome, lacks the mental capacity to act as a therapist.

53.    On or about February 2023, Lemos issued a statement to Brazilian Officials, misleadingly asserting that Mannelli was totally lucid, had a minor skin cancer, enjoyed a harmonious association with Praxedes, and was safely housed under his care on the SP Property.

54.    On or about September 2023, in furtherance of the conspiracy, Lemos re-issued the exact same statement in an effort to once again mislead Brazilian Officials.

---

[6] Defendants' social media posts prior to 2022 do not include a single mention or photo of Mannelli. Thereafter, Defendants began posting images of Mannelli on various social media platforms, which continues. For example, a social media post on Instagram shows the frail Mannelli seated in a staged manner allegedly "giving a lecture" to a group of young nurse students procured by Praxedes.

55.     During a two-month period where Lazo was in Brazil and, therefore, unable to sit for the bar exam in the U.S., Lazo made several attempts to visit Mannelli. As explained, given Praxedes' control of the entry gate, Lazo had to obtain his permission to access Mannelli. On or about April 2024, Lazo was intimidated by Praxedes who waved at her a police report wherein Mannelli purportedly alleged "discomfort" with Lazo's visitation.

56.     Suspicious of the basis for the police report, Lazo hired an attorney to contact the police department, and was informed that Mannelli had been taken there a second time, by members of the gang, to change the original version of the events.

57.     The "revised version" of events falsely alleged that Lazo had "invaded the property," entered Mannelli's house, threw papers on the floor in search of documents, and declared to Mannelli "Stay quiet, otherwise I'm going to end your life, you bitch!" (*English translation*). Acting as witnesses and in furtherance of the conspiracy were Praxedes, Santos (the purported "caretaker"), and França (the drug-addicted, recently-released violent felon). This malicious and false police report sought to obtain a Protective Order that, if granted, would have prevented Lazo from any contact with Mannelli. Through great personal and financial expense, Plaintiffs were able to present evidence of the truth and avert the Protective Order.

58.     Signs of the conspiracy against Plaintiffs abound. A doctored video recorded by Defendants in the premeditated ambush of Lazo,[7] actually shows <u>Mannelli</u> angrily snatching a small paper from Lazo's hand, screaming at Lazo, and incessantly calling Praxedes ("Pastor Hamilton, Pastor Hamilton, Pastor Hamilton . . .") thirteen times. These are horrifying symptoms of Dementia and parental alienation. In this video, Lazo, while in fear of her life, remains outwardly calm the entire time. Shortly after, Praxedes approaches Lazo and Mannelli for a

---

[7] Video presented to authorities in Brazil.

21

"conversation" and, due to her lack of verbal control, Mannelli blurts out the mechanics of Defendants' scheme: "We can say that Silvia [Lazo] invaded the house." Praxedes quickly silenced her: "Dona Sonia [Mannelli], the issue is being taken care of." During the parties' conversation, Praxedes attempted to extort Lazo by indicating that she could see Mannelli by foregoing legal action, including rights over the SP Property. Praxedes coldly adds: "this doesn't have to be devastating 'til the end." Here, Praxedes is referring to the death of Mannelli to extort Lazo and Shangrilá Partnership.

59.    In December 2024, out of deep concern, Lazo and long-term friends of Mannelli sought to visit Mannelli at the SP Property. Santos' partner, Selles, came to the gate and told Lazo that Praxedes would need to approve their entrance. Selles also stated that Mannelli was gravely ill: immobile, and refusing to eat, bathe, or take her medications on a regular basis. Lazo and her companions stood at the gate for 40 minutes under a scorching mid-summer sun waiting for Praxedes, wherein, upon his arrival, Praxedes immediately called Lemos in Holland, Michigan via WhatsApp, who, in real-time, gave orders to not open the gate. Lazo left crying and in despair for not being able to provide urgent medical care to her mother, Mannelli. Lazo was distraught in realizing that there might not be a last Christmas holiday with her loved one, Mannelli.

60.    As demonstrated, Defendants have conspired, and continue to conspire, to expedite Mannelli's death, seeking family and business assets for themselves and their enterprises.

61.    Upon information and belief, Praxedes and Lemos conspired to induce Mannelli to breach the contract with Plaintiffs, to enrich themselves and their enterprises.

62.     Defendants had actual notice of Plaintiffs' ownership and contractual rights with respect to the SP Property and other assets. Rather than acknowledging these rights, Defendants conspired to tortiously interfere with the relationship between Mannelli and Plaintiffs through criminal means, and worse, by physically and emotionally alienating Mannelli from her closest family members, Lazo and her husband.

63.     From February 2023 onward, Praxedes ramped up posts on social media channels for Defendants CTA and IBC soliciting donations to fund the conspiracy. The posts had global reach, including the U.S. Praxedes ability to make the media content and the electronic equipment utilized to communicate that content are directly related to Praxedes not paying rent, paying rent less than the market rate, and/or taking pension and/or other assets of Mannelli and/or Plaintiffs.

64.     Taking advantage of the elder's vulnerabilities, Defendants alienated Plaintiffs from Mannelli's life by persistently and continuously telling Mannelli that Plaintiffs are "after her income" and want to put her in an insane asylum. Defendants also removed all family photos from the elder's residence, and maintain her in precarious conditions, exacerbating her health problems and dependency on Defendants.

65.     Defendants spread malicious falsehoods concerning Plaintiffs to intentionally interfere with Plaintiffs' contract and business expectations.

66.     Defendants spread malicious falsehoods concerning Plaintiffs to intentionally damage the goodwill of Plaintiffs, personally and in their business.

67.     Plaintiffs have suffered financial losses as a result of Mannelli's induced breach of contractual obligations to Plaintiffs, as well as, personally, suffering from severe emotional distress in trying to correct the situation and provide care for the elder.

68.     Plaintiffs have no idea what has happened to the operating capital of Shangrilá Partnership, which includes the capital from the sale of the 10-unit inn in the popular international tourist town in the Northeast of Brazil.

69.     Defendants willfully, intentionally, malicious, and knowingly agreed and conspired with each other to engage in wrongful conduct, including Defendants' tortious interference with Plaintiffs' business contracts, relationships, and expectances, and other unfair business practices, as well as Defendants' trespass on the SP property.

70.     Defendants did the acts alleged pursuant to, and in furtherance of, that agreement and/or furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

71.     As a direct and proximate result of the acts in furtherance of the conspiracy, Plaintiffs suffered fear, injury, damage, loss, and harm, including, but not limited to, loss of profits, loss of capital, and loss of future profits. The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

72.     Defendants also had full knowledge of or should have reasonably known of the true nature of the wrongful conduct of each other Defendant, and aided and abetted such wrongful conduct, including tortious interference with Plaintiffs' business contracts, relationships, and expectancies, and other unfair business practices, as well as Defendants' trespass on, the SP property, by providing substantial assistance and/or encouraging the others to act.

73.     Defendants also aided and abetted the described wrongful conduct of the other Defendants by giving substantial assistance and/or encouragement that, separately considered, was wrongful in and of itself.

74.    As a direct and proximate result of the aiding and abetting of these acts, Plaintiffs have suffered fear, injury, damage, loss, and harm, including, but not limited to, loss of profits from current and potential real estate transactions and other transactions, particularly as to the SP Property. The wrongful conduct aided and abetted by the Defendants was a substantial factor in causing this harm.

75.    Defendants' intentional agreement to commit, and commission of, these wrongful acts, and aiding and abetting of these wrongful acts, was willful, malicious, oppressive, and in conscious disregard of Plaintiffs' rights, and Plaintiffs are therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

76.    Plaintiffs have always assisted Mannelli in the maintenance of her retirement funds, including U.S. Social Security benefits. Defendants have intentionally interfered with this aspect of Plaintiffs' relationship.

77.    Upon information and belief, Defendants have stolen Brazilian pension monies of Mannelli and possibly U.S. Social Security benefits of Mannelli, which are part of the retirement monies of Mannelli to be managed by Plaintiffs.

78.    From 2022 to the date of this Complaint, Plaintiffs' costs and expenses alone (e.g., travel, lodging, medical experts, legal, and other), in Plaintiffs' exhausting attempts to address and stem the harm caused by Defendants, are in excess of $250,000. These costs include domestic costs and, hence, domestic injury to Plaintiffs, including domestic injury to business or property. Plaintiff Lazo's life has been placed at risk multiple times, while that of her mother and business agent, Mannelli, is perpetually at risk.

79.    Plaintiffs' SP Property is one of the few remaining large parcels within an extremely dense community that has sprung up over the years in a relatively unplanned manner.

Per the U.S. State Department, this community ("*comunidade*") may possibly be classified as a community of "informal housing developments", which may be accompanied by an elevated travel rating (e.g., "[e]ven in these communities that the police or local governments deem safe, the situation can change quickly and without notice"). Lazo, her husband, and Mannelli have always taken precautions, with guidance from Mannelli who had, prior to her sequestration by Defendants, become somewhat of a fixture in the neighborhood. Mannelli and Plaintiffs invested in building a stellar reputation and goodwill within the community, i.e., intangible assets built over a period of decades through significant investment of time and money. Defendants are now, in a deviously twisted manner, palming-off this goodwill to advance their own pecuniary and other goals. To Plaintiffs and others that have known Mannelli for years, Defendants' social media posts on U.S.-based Facebook and Instagram objectify and humiliate this vulnerable adult. When the truth is exposed to all, it will become apparent that Defendants, in furtherance of their conspiracy, have severely tarnished and greatly devalued Plaintiffs' intangible assets. Without such exposure, there is no indication that Defendants will ever abate their pattern of racketeering such that the goodwill of Mannelli and Plaintiffs will be fully consumed in feeding their racketeer influenced and corrupt organization.

80.    Plaintiffs bring this lawsuit to seek justice, with a hope to break the conspiracy by striking at the mastermind, Lemos, who operates with an unbridled sense of impunity comfortably from her home in Holland, Michigan, which is within the Western District. Through expeditious justice, Plaintiffs pray that they can be reunited with and care for their loved one, Dona Sonia Mannelli, who also served faithfully, for years, as their business agent. However, given Mannelli's current state of health and unrelenting abuse by Defendants, Plaintiffs cannot realistically be optimistic that they will be reunited in this lifetime.

26

## COUNT I

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

81.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

82.    Defendants' conduct was and continues to be extreme and outrageous. Defendants have sequestered Mannelli and prevented her from receiving desperately needed medical care, while causing Mannelli to take unadvised drug cocktails. Defendants filed fraudulent police reports attempting to legally sever familial ties.

83.    Defendants' conduct was and continues to be intentional or reckless. As explained herein, Defendants' conduct is in furtherance of a conspiracy effectuated via their racketeering activities.

84.    Defendants' conduct caused and continues to cause Lazo severe emotional distress. Defendants' conduct is aimed at both Lazo and Mannelli to cause Lazo severe emotional distress. Defendants Praxedes and Lemos have coordinated their conduct in furtherance of the conspiracy effectuated via their racketeering activities.

85.    Defendants' conduct caused and continues to cause Plaintiffs damages, including personal injury to Lazo and injury to Plaintiffs' business or property.

## COUNT II

## TORTIOUS INTERFERENCE WITH CONTRACT

86.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

87.    Plaintiffs had a contract with Mannelli at the time of the claimed interference, for example, the aforementioned 2015 contract between Plaintiffs and Mannelli.

88.     Defendants knew of the contract because Lazo verbally and otherwise informed Defendants of the existence of contractual obligations, to which Defendants turned a blind eye.

89.     Defendants intentionally interfered with and continue to intentionally interfere with the contract. Defendants have intentionally interfered at least by taking over the SP Property and not accounting for rents. Further, Defendants have intentionally interfered with Plaintiffs' access to their agent, Mannelli.

90.     Defendants improperly interfered with and continue to improperly interfere with the contract. Defendants' improper interference is fraudulent, not lawful, not ethical, and/or not justified under any circumstances. Any of Defendants' conduct that was lawful, is still improper because it was done without justification and for the purpose of interfering with Plaintiffs' contractual rights.

91.     Defendant's conduct caused Mannelli to breach contractual obligations, at least those of the 2015 contract.

92.     Plaintiffs were damaged and continue to be damaged as a result of Defendant's conduct.

<u>**COUNT III**</u>

<u>**TORTIOUS INTERFERENCE WITH BUSINESS**</u>

<u>**RELATIONSHIP OR EXPECTANCY**</u>

93.     Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

94.     Plaintiffs had a business relationship or expectancy with Mannelli at the time of the claimed interference. As explained, Mannelli served as Plaintiffs' agent in numerous business transactions.

95.    The business relationship or expectancy had a reasonable likelihood of future economic benefit for Plaintiffs. As explained, Plaintiffs' business transactions had economic benefit and reasonable likelihood of future economic benefit.

96.    Defendants knew of the business relationship or expectancy at the time of the claimed interference. As explained, Lazo verbally and otherwise informed Defendants of Plaintiffs' business relationship or expectancy.

97.    Defendants intentionally interfered with the business relationship or expectancy. Defendants have intentionally interfered at least by taking over the SP Property and not accounting for rents. Further, Defendants have intentionally interfered with Plaintiffs' access to their agent, Mannelli.

98.    Defendants improperly interfered and continue to improperly interfere with the business relationship or expectancy. Defendants' improper interference is fraudulent, not lawful, not ethical, and/or not justified under any circumstances. Any of Defendants conduct that was lawful, is still improper because it was done without justification and for the purpose of interfering with Plaintiffs business relationship or expectancy.

99.    Defendants' conduct caused and continues to cause Mannelli to disrupt or terminate the business relationship or expectancy.

100.    Plaintiffs were damaged and continue to be damaged as a result of Defendants' conduct.

## COUNT IV

## CIVIL CONSPIRACY

101.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

102.    Defendants illegally, maliciously, and wrongfully conspired and continue to illegally, maliciously, and wrongfully conspire with one another through an intentional agreement or preconceived plan by acting in concert to intentionally inflict emotional distress, to tortiously interference with the contract, and to tortiously interfere with business relationship or expectancy with Mannelli at the time of the claimed interference. Further, Defendants conspired and continue to conspire to commit crimes, including crimes that are predicate acts under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO").

103.    Plaintiffs were damaged and continue to be damaged as a result of Defendants' conduct.

## COUNT V

## CIVIL EXTORTION MCL 750.213

104.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

105.    Defendants have (1) maliciously threatened, orally or by written or printed communication. For instance, Defendants threatened Lazo at the SP Property, including threats made by Defendant Praxedes upon order of Defendant Lemos.

106.    Defendants have (2) either (a) accused Lazo of a crime or offense or (b) caused injury to one or more of: Lazo, Shangrilá Partnership, Plaintiffs' property, Mannelli (Lazo's mother), and Lazo's husband. For instance, Defendants actually filed a false police report against Lazo.

107.    Defendants acted (3) with intent thereby either to (a) extort money or any pecuniary advantage whatever, or (b) compel one or more of: Lazo, Mannelli, and Lazo's husband, so threatened to do or refrain from doing any act against her or his will. As explained,

in multiple instances, Lazo was compelled to retreat from the SP Property in fear of her life, including economic fear of Plaintiffs' business or property.

108.    Plaintiffs have been and continue to suffer harm and damages that are personal and to business or property, including personal and economic fear, due to Defendants' actions (*see also* RICO predicate acts).

## COUNT VI

## CIVIL INTIMIDATION – MONTANA

109.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

110.    Under Mont. Code Ann. § 45-5-203, Defendants Lemos and Praxedes have individually and in conspiracy, on multiple occasions, intimidated Lazo and/or Mannelli.

111.    Each of Defendants Lemos and Praxedes communicated to Lazo at least one threat to inflict physical harm on Lazo and/or Mannelli and/or to subject Lazo and/or Mannelli to physical confinement or restraint. As explained, for example, Defendants have sequestered the immobile Mannelli in a rundown, hillside shack. As explained, for example, Defendants restrained Lazo at the SP Property. As explained, for example, Defendants filed a false police report against Lazo to seek a Protective Order to restrain Lazo.

112.    Each of Defendants Lemos and Praxedes was without legal authority to perform the threatened act(s).

113.    The circumstances reasonably tended to produce a fear, including personal fear and economic fear, that the threat would be carried out.

114.    Each of Defendants Lemos and Praxedes had the purpose to cause Lazo and/or Mannelli to perform and/or to omit the performance of one or more acts.

115.    Plaintiffs suffered harm due to each of Defendants Lemos' and Praxedes' intimidation, including personal injury and injury to business or property, including suffering of economic fear (*see also* RICO predicate acts).

## COUNT VII

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962(c)

116.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

117.    At all relevant times, continuing through the filing of this Complaint, Lazo and Shangrilá Partnership is each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

118.    At all relevant times, continuing through the filing of this Complaint, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

119.    Plaintiffs have been and continue to be harmed and thereby suffer from and continue to suffer from injuries stemming from the RICO Defendants' predicate acts, which show no signs of abating.

### The RICO Enterprise(s)

120.    The RICO Defendants, being at least Lemos and Praxedes, and one or more of their co-conspirators, whether parties or non-parties, are a group of "persons" associated together in fact ("an association-in-fact") for the common purpose of carrying out an ongoing enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a multi-faceted campaign of lies, fraud, threats, official corruption, and other crimes as part of a war of attrition aimed to have Plaintiffs give up their fight for family and business assets, whether tangible, intangible, or tangible and intangible. These RICO Defendants and their co-conspirators have

organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating from Holland, Michigan, via the mastermind Lemos, and funded primarily from the U.S., and directed mainly from the U.S. The SP Property exists because of the many years of Plaintiffs' U.S. investment dollars in the SP Property, which included funds expended to maintain that property (grounds, buildings, taxes, etc.), as managed in part through their agent, Mannelli, a U.S. Permanent Resident Card awardee. As explained, Plaintiffs' business touches on interstate and foreign commerce, including international tourism. As explained, Plaintiffs conducted their business in the U.S., including during visits of Mannelli to the U.S. Over a period of years, the RICO Defendants have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities. While the organization of the one or more enterprises has changed over time, and its members may have held different roles at different times, the one or more enterprises have generally been structured to operate as a unit or units in order to accomplish the goals of their schemes.

121.    The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise.

122.    At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

**Pattern of Racketeering Activity**

123.    The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering

activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

### Malicious threats to extort money, MCL 750.213

124.    At all times material to this Complaint, Plaintiffs were engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

125.    The RICO Defendants threatened to injure Lazo, that is RICO Defendant Lemos, while resident in Holland, Michigan, instructed RICO Defendant Praxedes, via electronic means (wire), in real-time, to threaten Lazo if Lazo tried to enter through the front gate of the SP Property to see Mannelli. Further, RICO Defendant Praxedes showed Lazo that he had procured attack dogs to roam loose on the SP Property, which would attack if she entered. As a result, Lazo suffered emotional distress and fear of self and economic harm. In fear of her safety, Lazo purchased a bulletproof vest, contracted an off-duty police officer as an armed guard, and contracted an armored vehicle. Yet further, Lemos, while in Holland, Michigan, has communicated, via wire, to Lazo in Missoula, Montana; and, Praxedes, operating pursuant to orders of Lemos, has communicated, via wire, to Lazo in Missoula, Montana. Hence, Lemos and Praxedes, as RICO Defendants, have through interstate and foreign communication channels reached Lazo in Missoula, Montana in furtherance of their extortion and other crimes.

126.    The RICO Defendants threatened to injure Lazo's diabetic mother, Mannelli, in that they instructed a co-conspirator to feed Mannelli tubs of sugar-laden ice cream to dysregulate her blood sugar levels and in that they blocked entry of local government healthcare professionals seeking to assist the elder, suffering from cancer, dementia, and other ailments.

127.    The RICO Defendants threated to injury Plaintiffs' property, that is, that the RICO Defendants threatened to take Plaintiffs' property by more than one means, including telling

Lazo that "this doesn't have to be devastating 'til the end" (English translation) in an effort to coerce Lazo to give up her property to the RICO Defendants.

128.    The RICO Defendants' threats have been made orally in-person, orally by electronic means, and in written form, through electronic means and by fraudulent submissions to Brazilian Officials and institutions in Brazil.

129.    The RICO Defendant Praxedes' threats have been made via false statements to the São Paulo police in Brazil. Specifically, false statements brought about an inquiry against Lazo in Brazil.

130.    The RICO Defendants made their threats willfully, without just cause or excuse, against one or more of Lazo, Mannelli (Lazo's mother), and Lazo's husband, and with the intent to get property by doing it, with the intent to make one or more of Lazo, Mannelli (Lazo's mother), and Lazo's husband do or not do something against his or her will, and/or with the intent to invoke personal and/or economic fear.

### Robbery and Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951

131.    At all times material to this Complaint, Plaintiffs were engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

132.    As described herein, the RICO Defendants have engineered a wide-ranging campaign of personal attacks against Plaintiffs based on false and misleading statements, manufactured criminal offenses, threatened fraudulent judgments, created ongoing disruptions of business operations, and have confounded legitimate avenues of redress in Brazil, attempting to and effectively robbing Plaintiffs of property, income therefrom, and other business assets, all with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiffs.

133.    As described herein, Lemos, while in Holland, Michigan, has communicated, via wire, to Lazo in Missoula, Montana; and, Praxedes, pursuant to orders of Lemos, has communicated, via wire, to Lazo in Missoula, Montana. Hence, Lemos and Praxedes, as RICO Defendants, have through interstate and foreign communication channels reached Lazo in Missoula, Montana in furtherance of their robbery, extortion, attempted robbery, or attempted extortion.

134.    As described herein, the RICO Defendants manufactured false evidence against Plaintiffs and are relying on that false evidence as a sham front with the intent and effect of causing a reasonable fear of economic loss on the part of Plaintiffs.

135.    As described herein, the RICO Defendants conspired to advance baseless criminal allegations to rob Plaintiffs and/or extort property from Plaintiffs or to attempt to rob Plaintiffs and/or attempt to extort property from Plaintiffs.

136.    The RICO Defendants' actions are intended to induce fear in Plaintiffs that the RICO Defendants will, among other things: (1) continue to pursue a scheme of misrepresentation to the great harm and denigration of Plaintiffs, unless Plaintiffs cease and desist of pursuing justice; (2) continue to attempt to conspire with Brazilian Officials to have Lazo fraudulently prosecuted; and (3) secure a fraudulent judgment against Plaintiffs seeking recognition and enforcement of the judgment. These actions, as described herein, have created a reasonable fear of harm on the part of Plaintiffs, including fear of economic loss, at least in part through robbery of their real property and other assets.

137.    Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by robbery or

extortion, as those terms are defined in § 1951, in that the RICO Defendants attempted to induce Plaintiffs to consent to relinquish property through the wrongful use of actual and threatened force, violence, and fear—including fear of economic harm.

### Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. 1341, 1343

138.    As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Plaintiffs, Government Officials, and the greater public concerning Plaintiffs, attempting to collude with Government Officials, including via the RICO Defendants' manufactured declarations to the police and others. The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to rob and coerce Plaintiffs in a manner that will directly benefit the individual and organizational RICO Defendants.

139.    In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be de-posited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following: emails and website postings incorporating false and misleading statements regarding Plaintiffs and Mannelli; wirings and/or mailings between and among the RICO Defendants concerning false police reports; and funds raised through social media posts, via U.S. media companies and reaching the US citizenry, where such funds were retained and/or transferred by and/or between the RICO Defendants, with the intent that those funds be used to promote the carrying on of the RICO Defendants' criminal activities.

140.    Further, Plaintiffs allege RICO Defendants have made particular uses of wire and mail communications in furtherance of the RICO Defendants' scheme or artifice to defraud that

constitute violations of 18 U.S.C. §§ 1341 and 1343, including which one or more individual Defendants caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

141.    Yet further, Lemos, while in Holland, Michigan, has communicated, via wire, to Lazo in Missoula, Montana; and, Praxedes, pursuant to orders by Lemos, has communicated, via wire, to Lazo in Missoula, Montana. Hence, Lemos and Praxedes, as RICO Defendants, have through interstate and foreign communication channels reached Lazo in Missoula, Montana in furtherance of their crimes.

142.    The RICO Defendants wire fraud violations span a period of years and continue, including, at least:

June 25, 2022 text message from Praxedes in Brazil communicating to Lazo in Missoula, Montana, where Praxedes stated "she [Mannelli] continues to make good choices", intentionally and maliciously misrepresenting that Mannelli is mentally capacitated, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

August 13, 2022 phone call from Lemos in Holland, Michigan communicating to Lazo in Missoula, Montana, where Lemos stated "[t]he people that tend to her [Mannelli] have been around her for like 40 years", intentionally and maliciously misrepresenting that Lemos' co-conspirators have been around Mannelli for 40 years and tending to her needs, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

On or about November 18, 2022 text message from Lemos in Holland, Michigan communicating to Praxedes in Brazil, as shown to a Brazilian Official, wherein both

Praxedes and Lemos voluntarily, intentionally, and maliciously devised or participated in a scheme to defraud Plaintiffs, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

February 8, 2023 sworn statement from Lemos from Holland, Michigan communicated to Brazilian Official, intentionally and maliciously misrepresenting that Mannelli is "not incapacitated", is being "medically treated for cancer of the skin", and works as "an emotional therapist" at Defendant CTA, while being cared for by "a substitute family", which includes Praxedes and Santos, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

September 1, 2023 sworn statement from Lemos from Holland, Michigan communicated to Brazilian Official, for a second time, intentionally and maliciously misrepresenting that Mannelli is "not incapacitated", is being "medically treated for cancer of the skin", and works as "an emotional therapist" at Defendant CTA, while being cared for by "a substitute family", which includes Praxedes and Santos, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

February 24, 2024 Instagram post from Praxedes and CTA communicating to a global audience, intentionally and maliciously misrepresenting that Mannelli is an Official Therapist of CTA, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

December 6, 2024 WhatsApp (phone) call from Praxedes in Brazil communicating to Lemos in Holland, Michigan, wherein both Praxedes and Lemos voluntarily, intentionally, and maliciously devised or participated in a scheme to defraud

Plaintiffs, in furtherance of the RICO Defendants' scheme or artifice to defraud as part of a pattern of racketeering.

143.    The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Plaintiff for the benefit of the RICO Defendants and their co-conspirators. The RICO Defendants knowingly and intentionally prepared self-serving, fraudulent statements with the intent to deceive Brazilian Officials and others. The RICO Defendants knew these statements to be false or misleading, to be disseminated to the general public, and to Government Officials, with the intent that those statements be believed and that they form the basis for further public attacks on Plaintiffs, investigations of Plaintiffs, and reduction in the value of Plaintiffs' business assets. The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Plaintiffs such that Plaintiffs would ultimately pay or surrender property for RICO Defendants to cease their conduct.

144.    The RICO Defendants' false and misleading statements have been relied on by Brazilian police, other Officials, and others, by means of acceptance of Defendants' misrepresentations and omissions and failures to take meaningful corrective action. Further, RICO Defendants' false and misleading statements have caused Plaintiffs substantial damages.

**Money Laundering in Violation of 18 U.S. C. 1956(a)(2)(A)**

145.    The RICO Defendants have on multiple occasions, acting in their individual capacities have knowingly caused the transportation, transmission, and/or transfer of funds to or from the U.S. to themselves and to one or more other RICO Defendants and/or one or more other entities with the intent that those funds be used to promote the carrying on of unlawful activity in

violation of 18 U.S.C. §§ 1341, 1343 and 1951, including funding of the RICO Defendants'

pressure campaigns against Plaintiffs' via false statements to law enforcement institutions,

wherein the Defendants' fund raising campaigns have been funded at least in part through

racketeering and conversion of Plaintiffs' property. As explained, upon information and belief,

Mannelli's U.S. Social Security benefits may be at play.

**Intimidation: Mont. Code Ann. § 45-5-203**

146.    Each of the RICO Defendants has engaged in multiple instances of intimidation in

violation of Mont. Code Ann. § 45-5-203. Each of the RICO Defendants have on multiple

occasions, acting in their individual capacities have, with criminal intent, intimidated Lazo

and/or Mannelli.

147.    Each of the RICO Defendants communicated to Lazo and/or Mannelli at least one

threat to inflict physical harm on Lazo and/or Mannelli and/or to subject Lazo and/or Mannelli to

physical confinement or restraint. Each of the RICO Defendants communicated to Lazo, while

Lazo was present in the State of Montana, at least one threat to inflict physical harm on Lazo

and/or Mannelli and/or to subject Lazo and/or Mannelli to physical confinement or restraint.

Each of the RICO Defendants communicated by means of wire, including social media via U.S.-

based social media platforms, including Instagram and Facebook, to intimidate while

additionally promoting the affairs of the enterprise, including the affairs of Defendants CTA and

IBC. Yet further, Lemos, while in Holland, Michigan, has communicated, via wire, to Lazo in

Missoula, Montana; and, Praxedes, pursuant to orders from Lemos, has communicated, via wire,

to Lazo in Missoula, Montana. Hence, Lemos and Praxedes, as RICO Defendants, have through

interstate and foreign communication channels reached Lazo in Missoula, Montana in

furtherance of their intimidation campaign.

148.    Each of the RICO Defendants was without legal authority to perform the threatened acts.

149.    The circumstances reasonably tended to produce a fear in at least Lazo that the threat would be carried out.

150.    Each of the RICO Defendants had the purpose to cause Lazo and/or Mannelli to perform and/or to omit the performance of one or more acts.

151.    Plaintiffs suffered harm due to each of the RICO Defendants intimidation, including personal injury and injury to business and/or property.

**Summary of Pattern of Racketeering Activity Alleged Against Each RICO Defendant**

152.    Each of the RICO Defendants has engaged in multiple predicate acts, as described, supra. The conduct of each of the RICO Defendants described, supra, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

153.    Plaintiffs were injured in their business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Plaintiffs caused by reason of the violations of 18 U.S.C. § 1962(c) include, but are not limited to, damage to Plaintiffs' business reputation and goodwill; the impairment of Plaintiffs' business interest in executed contracts, including a contract with Mannelli; and the attorneys' fees and costs to defend itself in an objectively baseless, improperly motivated sham police investigation in Brazil and, now, in litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud.

154.    Further, these injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of the violation of 18 U.S.C. § 1962. Plaintiffs are the ultimate victims of the

RICO Defendants' unlawful enterprise(s). Plaintiffs have been and will continue to be injured in their business and property in an amount to be determined at trial.

155.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

156.    Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any judgment in any court, tribunal, or administrative agency in any jurisdiction, in the U.S. or abroad, including any attempt to attach or seize any of Plaintiffs subsidiary's or co-venturer's assets, whether pre judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiffs' claims against the Defendants in this action.[8]

157.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

## COUNT VIII

## RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18 U.S.C. § 1962(a)

158.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth herein.

159.    Plaintiffs are injured under § 1962(a) from the RICO Defendants' investment of racketeering income in one or more enterprises that have caused harm, including harm to others. Per § 1962(a): It shall be unlawful for any person who has received any income derived, directly

---

[8] The factual contentions in this paragraph will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

160.    As explained herein, the RICO Defendants utilized the SP Property and income or other benefits derived from their racketeering to generate advertisements posted on U.S.-based social media platforms wherein the advertisements, having global reach, were misleading to defraud people into sending money to Defendants CTA and IBC. Additionally, these social media posts, particularly those denigrating Plaintiffs' agent Mannelli, were deliberately aimed at Plaintiffs in the U.S., to injury Plaintiffs in the U.S. Further, upon information and belief, Lemos, a U.S. citizen and resident, has an interest in CTA, IBC, or one or more other enterprises, whether foreign or domestic, that has received investment of racketeering income to the detriment of Plaintiffs and to injure Plaintiffs. As explained, Mannelli's U.S. Social Security benefits may be at play. Ultimately, given that Lemos is a U.S. citizen, any racketeering income invested in an enterprise associated with Lemos, which may be Lemos herself, is a domestic investment of racketeering income in violation of § 1962(a).

161.    Additionally, as explained herein, the RICO Defendants utilized the SP Property or other benefits derived from their racketeering to alter the SP Property and structures thereon, including erecting a large 10' x 25' sliding metal entry gate, by which the RICO Defendants strictly control access to the SP Property, including strict control of access to Lazo, healthcare professionals tasked with seeing Mannelli, and others. These alterations represent racketeering income investments that are domestic, particularly where Lemos, a U.S. citizen and resident, has

an interest in one or more of the benefiting enterprises, which can include Lemos, herself, as an

enterprise.

162.    The RICO Defendants' investments of racketeering income have resulted in injury

to Plaintiffs, and others, including personal injury and injury to business or property. The injury

to Plaintiffs includes injury that is separate from direct injury suffered from the RICO

Defendants' racketeering. [9]

### COUNT IX

### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO) 18

### U.S.C. § 1962(b)

163.    Plaintiffs hereby incorporate and reallege all other paragraphs as if fully set forth

herein.

164.    Pursuant to 18 U.S.C. §1962(b), it is unlawful "for any person through a pattern

of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control

of any enterprise . . .."

165.    Plaintiffs are injured under § 1962(b) from the RICO Defendants' acquisition of

an interest in or control over one or more enterprises. In particular, Plaintiffs are injured in that

the enterprises, Defendants CTA and IBC, are operating using Plaintiffs' SP Property and from

Plaintiffs' SP Property. The RICO Defendants are entrenching these enterprises in the SP

Property and advertising via social media and other means that the RICO Defendants own and

control the SP Property. The local sentiment is that Defendant Praxedes owns the SP Property

and that he acts like the owner of the SP Property, including hosting events there and controlling

---

[9] The factual contentions in this paragraph will likely have additional evidentiary support after a
reasonable opportunity for further investigation or discovery.

access thereto. As contraction obligations with agent Mannelli include obligations for sale of the SP Property, this local sentiment is confounding goodwill and trust in Plaintiffs and their agent, Mannelli, which has a direct impact on the ability to sell the SP Property and the true fair market value of the SP Property.

166.    As set forth herein, at a minimum, the RICO Defendants have taken control of Mannelli, Plaintiffs' agent. Mannelli, herself, is an enterprise that has been infiltrated by the RICO Defendants as a result of their racketeering activities, where Mannelli is injured and Plaintiffs are injured. The RICO Defendants control Mannelli, as an enterprise; the RICO Defendants gained and maintain control of Mannelli through a pattern of racketeering; and Mannelli, herself as an enterprise, affects interstate and foreign commerce, particularly because she is Plaintiffs' agent, where Plaintiffs are a U.S. citizen and a U.S.-based partnership.

167.    As set forth herein, the RICO Defendants have, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, one or more interests in or control of one or more enterprises, resulting in injury to at least business or property of Plaintiffs. [10]

## COUNT X

## CONSPIRACY TO VIOLATE RICO OF 18 U.S.C. § 1962(d)

168.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

169.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. §§ 1962(a), 1962(b), and 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

---

[10] The factual contentions in this paragraph will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

170.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate §§ 1962(a), 1962(b), and 1962(c), in violation of 18 U.S.C. § 1962(d).

171.    Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

172.    Upon information and belief, the RICO Defendants agreed to make investments in one or more enterprises (e.g., Defendants CTA or IBC, or both, or other(s)) stemming from their racketeering in violation of 18 U.S.C. § 1962(a).

173.    Upon information and belief, the RICO Defendants, through a pattern of racketeering, agreed to acquire or maintain, directly or indirectly, an interest in or control of maintain and control one or more enterprises (e.g., Defendants CTA or IBC, or both, or other(s), which may include Mannelli herself as an enterprise) stemming from their racketeering in violation of 18 U.S.C. § 1962(b).

174.    Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Plaintiffs and to injure Plaintiffs in their business or property, including domestic injury in Plaintiffs' business or property. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth, supra.

175.    As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and

violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property, including, but not limited to, damage to Plaintiffs' business reputation and goodwill; the impairment of Plaintiffs' interest in executed contracts, including the SP Property and contract; and the attorneys' fees and costs to defend itself in an objectively baseless, improperly motivated sham police investigation in Brazil and, now to bring litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud.

176.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

177.    Plaintiffs are further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them from commencing, prosecuting, or advancing in any way directly or indirectly—any attempt to recognize or enforce any judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any of Plaintiffs' or Plaintiff subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Plaintiffs' claims against the Defendants in this action.

178.    WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter a Judgment in their favor and against all Defendants–jointly and/or severally, as appropriate–that includes the following relief:

A.    An amount to be determined at trial, but not less than $600,000, representing the value of intentional infliction of emotions distress;

B.      An amount to be determined at trial, but not less than $600,000, representing disgorgement and/or restoration of any and all revenues, earnings, profits, compensation, and benefits any of the Defendants may have obtained, but not limited to, returning any revenue earned from the unlawful and unfair use of Plaintiffs' property, and enjoinment from further unlawful, unfair, and deceptive business practices;

C.      An amount of money due from Defendants to Plaintiffs to the extent unknown to Plaintiffs as ascertained by an accounting of the income and gross profits Defendants have obtained through their wrongful and unlawful conduct.

D.      Treble damages in accordance with 18 U.S.C. § 1964;

E.      An award of punitive damages to punish the wrongful conduct and deter future wrongful conduct of Defendants;

F.      Plaintiffs' attorneys' fees and costs;

G.      Pre-judgment and post-judgment interest; and

H.      Any other relief, legal or equitable, that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand trial by jury on all issues and counts so triable.


Respectfully submitted,


Dated: Feb. 10, 2025                s/  Brian J. Pangrle

                                    Brian J. Pangrle (223085)
                                    3500 West Olive Avenue, 3rd Floor
                                    Burbank, CA 91505
                                    818-395-4194
                                    brian@ppbdlaw.com
                                    *Attorney for Plaintiffs*

**PANAGOS KENNEDY PLLC**
Linda D. Kennedy (P64692)
Bill C. Panagos (P34068)
3331 West Big Beaver Road
Troy, Michigan 48084
Phone & Fax: (248) 564-1343
lkennedy@paniplaw.com
bpanagos@paniplaw.com
***Attorneys for Plaintiffs***